

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JESSICA SONYA GUERRA, | § | No. 08-22-00183-CR |
| Appellant, | § | Appeal from the |
| v. | § | 346th Judicial District Court |
| STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20210D02664) |

## MEMORANDUM OPINION

This case involves a multi-vehicle collision leading to one fatality and several injuries. Afterwards, Appellant Jessica Sonya Guerra was indicted on three counts of involvement in an accident resulting in personal injury, where defendant intentionally and knowingly failed to stop and comply with duties to give information and render aid (Counts I, III, and IV), one count of intoxication manslaughter with a vehicle (Count II), one count of murder (Count V), one count of driving while intoxicated, where defendant's blood specimen analysis showed an alcohol concentration level of 0.15 or more, and defendant had been twice previously convicted of driving while intoxicated (Count VI), and three counts of aggravated assault with a deadly weapon, namely, a motor vehicle (Counts VII, VIII, IX).

A jury found Guerra guilty on all counts except the one count charging murder (Count V). Following the jury's recommendations, the trial court assessed punishment on all counts, with punishment running concurrently, as follows: five years' confinement and a $5,000 fine for each count of accident involving injury, such sentences to be probated; 14 years' confinement and a $10,000 fine for one count of intoxication manslaughter; 14 years' confinement and a $10,000 fine for three counts of aggravated assault with a deadly weapon; and 10 years' confinement and a $10,000 fine for driving while intoxicated, third offense. On appeal, Guerra challenges the legal sufficiency of the evidence to support her convictions. She also brings three other complaints about matters during the trial: first, she complains of witnesses being permitted to testify via Zoom videoconference technology; second, she asserts that during deliberations, the jury became confused about the jury charge; third and lastly, she urges the trial court erred in reforming the jury's verdict on punishment as to Count IV. Finding no reversible error, we affirm.

## BACKGROUND INFORMATION

Viewing the evidence in the light most favorable to the verdict, as we must, the evidence established the following background information.

### A. The multi-vehicle collision

On July 3, 2021, at approximately 2:00 p.m., Ernest Saenz III was driving a brown Chevrolet truck on Montana Avenue in El Paso with his grandson, D.E.C.,[1] riding next to him in the passenger seat. While Saenz's truck remained at a complete stop waiting for a traffic light to turn green, a white truck driven by Guerra struck it from behind. The impact set off a chain reaction

---

[1] When he testified at trial, D.E.C. was 16 years old. Because he was a minor during all times relevant, we refer to him by his initials to protect his privacy. *See* TEX. R. APP. P. 9.10(a)(3).

wherein Saenz's truck, in turn, struck a red Dodge truck stopped in front of it. Erica Chavez was driving the red truck, and her mother, Maria Chavez, was sitting in the passenger seat.

At trial, D.E.C. testified that, upon impact, he lost consciousness. When he regained his sense of perception, he smelled smoke and saw that the airbag of the truck had deployed. He described, "[a]t first I was panicking a little bit, but I needed to make sure my grandpa was okay." He called his grandpa's name but there was no response; he appeared lifeless. D.E.C. called for help from people surrounding their vehicle. When he tried opening his passenger door, he discovered it was completely crushed. Someone shattered a window of the truck's door, and he exited. The bystanders also managed to get his grandpa out of the truck, and immediately began to administer CPR. Two ambulances arrived to take D.E.C. and his grandpa to the hospital. D.E.C. testified, however, that his grandpa died. He also described that he sustained injuries to his neck and arm due to the collision.

Maria Chavez testified that she and her daughter, Erica Chavez, were going down Montana Avenue in their Ram truck. She said they heard a "very strong blow." Erica testified that she looked in the rear-view mirror and saw the truck behind them coming towards them. She told her mom, "[t]hey're going to hit us." To avoid hitting the car in front of them, Erica moved the vehicle to the side, and it ended up in the median. Maria testified that, from the collision, she had pain in her leg, and it became swollen. Erica testified she lost some hearing. Also, she sustained a cut to her eye, and bleeding from her head. Both mother and daughter were transported to the hospital in an ambulance to receive medical attention. Finally, authorities reported that a gold van was also seen on scene with minor damage to its rear.

**B. Guerra's actions after the collision**

Damian Vazquez testified he was driving westbound on Montana. His brother, J.V.,[2] rode with him as a passenger. They heard a loud crash ahead and witnessed the tires of a white truck come up off the ground upon impact with a brown truck. Damian pulled over while J.V. called 911. Damian exited his vehicle to join other bystanders aiding occupants of the brown truck. As he approached to help, he heard something moving, and he turned his attention to the white truck. He first saw that the driver's airbag had deployed, blocking his view of the vehicle's interior. As he stood near the front of the truck, he saw a female exiting from the passenger side of the vehicle. She wore a dress, which appeared to be open, and he saw blood on her chest and face. The female repeated she needed to leave, but she appeared dizzy. Damian escorted her to his vehicle so she could wait inside with his brother, J.V.

While Damian and other bystanders helped render aid to Saenz, Damian saw the female of the white truck run from his car to a nearby trailer park. His brother, J.V., testified he had watched as she climbed over a wall, then ran inside the enclosed park. As authorities arrived on scene, Damian pointed them in the direction of where he had seen the female running. Sheriff's Deputy Vincent Delgadillo was among those who responded to the scene that day. While there, Damian and J.V. told him and another deputy that a female had fled from the scene into the adjacent trailer park. Deputy Delgadillo called in the description given and he went into the park to locate the female subject. A resident of the park pointed the deputies in the direction of where a female in a white dress, who was bleeding from her face, had been last seen. At the same time, Deputy Delgadillo received a call from dispatch notifying him that another deputy had located the

---

[2] Because J.V. was 17 years old at the time of trial, we also refer to him by his initials to protect his privacy. *See* TEX. R. APP. P. 9.10(a)(3).

4

subject in the rear of the park. As he walked to the location, he found a wallet on the ground. He took custody of the property after the lot owner confirmed it did not belong to her. Eventually, Delgadillo joined Sergeant Chavarria, who stood with the female subject located in the park. Deputy Delgadillo identified Guerra in the courtroom, testifying she was the female subject they had located that day. Deputy Delgadillo was soon assigned to escort Guerra to the hospital.

Sergeant Chavarria also testified to locating Guerra in the trailer park. The State admitted into evidence Sergeant Chavarria's bodycam footage recording his interaction with her as he first approached her. The video begins with Sergeant Chavarria asking about her condition. Her face and hair are covered in blood. Guerra responds, "No, I can't go to jail." Reaching out to help Guerra, Sergeant Chavarria replied, "No, you're not gonna go to jail, but I need to make sure—you're bleeding really bad. I gotta make sure you're okay." Stepping back and turning her back to Chavarria several times, Guerra repeatedly states she can't go to jail. Chavarria asked Guerra if she had been driving and she nods her head. She then says, "I didn't see when they stopped."

Other deputies soon approach with the previously found wallet after discovering it contained a driver's license belonging to Jesus Corral. Corral is later identified as Guerra's husband. As the officers are seen inspecting the wallet, Guerra repeats to Chavarria that she could not afford to go to jail. Chavarria asks her why she keeps saying that and Guerra responds, "I already have a third DWI and I can't afford this." When Chavarria asked her again if she was driving, Guerra responds, "I was driving," and further says, "I had somebody in the passenger." Sergeant Chavarria testified at trial that it had become clear to him that Guerra was intoxicated while he spoke with her. Sergeant Chavarria eventually transported Guerra back to the scene of the crash for her to obtain medical attention. As a firefighter approached to assist, she uttered to him that she was not driving.

Sergeant Chavarria confirmed they did receive a description of a male that possibly fled the scene. Witness descriptions varied as one described a tall male with glasses and long hair, and another described a not very tall man with short hair. Authorities never located any male subject at or near the scene.

## C. Other evidence

At trial, an El Paso Police Department deputy with the special traffic investigations unit testified that only the driver-side airbag of the white truck deployed, and not the passenger-side air bag. The investigator concluded it meant no passenger sat in the passenger seat at the time of the collision. The crash-data retrieval system showed the white truck travelled at a constant speed of 62 miles per hour, with no signs of braking. Additionally, the State presented evidence of blood found on the driver-side airbag and the exterior passenger-side door of the white truck. The test results established that Guerra could not be excluded as the single contributor of the tested blood. Two hair strands were also retrieved from the broken windshield of the white truck but there was insufficient sample for scientific interpretation. Evidence established that Guerra had a blood-alcohol concentration of .282 grams which was approximately three and half times greater than the legal limit of .08.

The investigating case agent also testified to his recovery of surveillance video from two bars and a beer depot located in the area. The agent described that Guerra and her husband, Jesus Corral, had been drinking at the bars prior to the collision. He further described that Guerra could be seen driving the white truck in the video depicting the outside of one of the bars the couple had visited. The State also presented evidence that a lipstick and two hair ties were found inside the driver-side interior pocket of the white truck. As a part of their investigation, a sheriff's deputy interviewed Jesus Corral, who was currently in custody for other "petty charges" not related to the

6

current case. Investigators testified they completely ruled out Corral as a suspect in the current case.

**D. The jury's verdict**

After deliberation, the jury returned a verdict of guilty for all counts except Count V, murder. The jury also answered special issues whereby it found Guerra did use a deadly weapon, to wit: a motor vehicle, in the commission of the offenses charged in Counts II, VII, VIII, and IX. The jury next heard evidence on punishment and returned its verdicts on punishment. As to the charges of accident involving injury—Counts I, III, and IV—the jury assessed punishment at five years' confinement and a $5,000 fine for each. As to each of these counts, the jury recommended the suspension of the term of confinement and any fine assessed, and for Guerra to be placed on community supervision. As to the intoxication manslaughter charge—Count II—the jury assessed punishment at 14 years' confinement and a $10,000 fine. As to the driving while intoxicated third or more charge—Count VI—the jury assessed punishment at 14 years' confinement with a fine of $10,000. Lastly, on the charges of aggravated assault with a deadly weapon—Counts VII, VIII, IX—the jury assessed punishment at 14 years' confinement and a fine of $10,000 for each. The trial court entered judgment in accordance with the jury's verdict, with the exception of the punishment for Count VI, which we address under issue three.

Guerra timely appealed.

## DISCUSSION

Guerra presents four issues on appeal. First, she argues the trial court improperly admitted testimony of two witnesses by use of Zoom. Second, Guerra argues the trial court erred in not granting a mistrial based on jury confusion. Third, Guerra asserts she is entitled to a new trial on

7

punishment because the trial court changed the jury's verdict. Fourth and last, she contends the evidence was insufficient to support a conviction for intoxication manslaughter and other charges.

We reorder the issues so as to address the legal sufficiency of the evidence first before reaching the remaining issues.

## A. Legal sufficiency

In her fourth issue, Guerra contends the evidence was insufficient to support her convictions because the State failed to present evidence from which a rational jury could have found that she was operating a motor vehicle when it crashed. Guerra contends the evidence showed that her husband, Jesus Corral, was the driver of the subject vehicle.

### (1) Standard of review

On legal sufficiency review, we assess all trial evidence "in the light most favorable to the prosecution," to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We review all record evidence—direct or circumstantial, properly admitted or not—in making this determination. *Clayton*, 235 S.W.3d at 778. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* at 15. Because the trier of fact is the sole judge of the weight of the evidence and credibility of the witnesses, we may not reevaluate the weight and credibility determination made by the fact finder. TEX. CODE CRIM. PROC. ANN. art. 38.04; *Margraves v. State*, 34 S.W.3d 912,

919 (Tex. Crim. App. 2000) (en banc); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

### (2) Applicable law

Guerra was convicted of three counts of accident involving injury, one count of intoxication manslaughter, one count of driving while intoxicated third or more, and three counts of aggravated assault with a deadly weapon. All of the counts for which Guerra was convicted require a finding beyond a reasonable doubt that Guerra operated a motor vehicle in a public place while intoxicated. *See* TEX. PENAL CODE ANN. §§ 49.07(a)(1), 49.08(a)(1); *see also Ex parte Watson*, 306 S.W.3d 259, 265 (Tex. Crim. App. 2009) (discussing elements of the offense). Guerra solely challenges her various convictions to the extent she argues the evidence did not allow a rational jury to conclude beyond a reasonable doubt that she was the driver of the vehicle that caused the accident.

### (3) Analysis

Guerra argues that, upon review of the trial record, no rational trier of fact could have found her guilty beyond a reasonable doubt of the "operation" element of the convicted counts. To start, she points to testimony from Edwing Ogaz, a witness called by the defense who testified he had been driving on Montana when a white truck or SUV sped past him in the adjacent lane before it moved into his lane and collided into another vehicle ahead. Ogaz saw two people riding in the white vehicle. He was 100% certain the driver was a male. Ogaz described the male as having long hair and a skin tone darker than his own. To assist with traffic, Ogaz parked his truck directly behind the crashed white truck. On scene, he saw the driver's side door of the white truck open, and a gentleman sat in the driver's seat. After the man exited the vehicle, he was last seen on the

9

side of the road. On cross-examination, Ogaz stated that he was sure it was a man—even though he only saw long hair—because the person wore pants, while the other person wore a dress. Ogaz could not give any more description of the man he saw. He described that he saw the man walking towards the curb. Ogaz did help the deputies in locating Guerra.

Second, Guerra contends the State's entire case hinged on the DNA evidence of the blood on the deployed airbag belonging to Guerra. Guerra asserts this evidence is easily explained by Ogaz's testimony that he saw her reaching over to the driver's seat to try and keep the male driver from leaving the scene. Therefore, Guerra contends, the State's evidence did not establish beyond a reasonable doubt that Guerra was operating the vehicle.

Contrary to Guerra's view of the case, the State also presented evidence from the two brother witnesses, one of whom described he had only seen Guerra exiting the white truck. As well, neither brother mentioned having seen a male as a likely driver of that vehicle. The record also included evidence that the passenger airbag of the white truck never deployed. An officer of the special traffic investigations unit testified that the single airbag deployment meant that no person rode in the passenger seat. Disputing this evidence, Guerra points to the evidence presented through an accident reconstructionist, Timothy Charles Lovett. Lovett testified that the white truck was capable of seating three people in the front, and a passenger could sit in the middle seat as opposed to the right-side passenger seat. He also testified that a person sitting in the middle would not cause the passenger airbag to deploy. Lovett also testified that he believed Guerra was sitting in the middle as her head injuries could have been caused by hitting the rear-view mirror. On cross-examination, Lovett acknowledged that he did not conduct any comparison between Guerra's injuries and the rear-view mirror of the vehicle. His conclusions were based solely on his visual evaluation of the crash-scene photographs and the photographs of Guerra's injuries.

Guerra also fails to account for the evidence established through the Sherriff's deputy's bodycam footage showing Guerra's repeated admissions that she was driving the vehicle at issue. The jury saw and heard evidence of Guerra's behavior following the accident including: inconsistent statements on whether she drove by herself, or rode as a passenger of the vehicle; her immediate flight from the scene and unwillingness to receive medical attention; and, her statements that she had a third DWI, that she "didn't see when they stopped," and that she would pay for everything. Based on our standard of review, we presume that the factfinder resolved the conflicts in Guerra's statements in favor of the prosecution and defer to that determination. *See Clayton*, 235 S.W.3d at 778.

The jury also could have disbelieved Ogaz's testimony about seeing a male driver; or they could reasonably conclude he misperceived the events. Additionally, the jury was free to believe or disbelieve any or all of Lovett's testimony. The jury is the trier of fact and the sole judge of the weight of the evidence and credibility of the witnesses. TEX. CODE CRIM. PROC. ANN. art. 38.04; *Margraves*, 34 S.W.3d at 919. We are forbidden from reevaluating the weight and credibility determinations that the trier of fact has made. TEX. CODE CRIM. PROC. ANN. art. 38.04; *Margraves*, 34 S.W.3d at 919. For this reason, we must defer to the jury's determination and resolve the inconsistency in favor of the verdict. *Curry*, 30 S.W.3d at 406.

Accordingly, we conclude there was legally sufficient evidence to support the jury's finding that Guerra operated a motor vehicle in a public place while intoxicated, and by reason of said intoxication she caused the death of one person and serious injuries to others. Considering all evidence in the light most favorable to the verdict, as we are required to do, we conclude the jury could have found the State proved all essential elements of the crimes charged beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.

11

We overrule Guerra's fourth issue.

## B. Zoom testimony

In Guerra's first issue, she contends the trial court was prohibited from allowing two of the State's witnesses to testify via Zoom videoconference technology without a written waiver from her. Guerra asserts the Zoom testimony resulted in violation of her constitutional rights under the Confrontation Clause. Responding, the State contends that Guerra affirmatively waived any asserted right to the physical presence of the State's witnesses.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI. This procedural guarantee, applicable to both federal and state prosecutions, bars the admission of testimonial statements of a witness who does not appear at trial unless the witness is unavailable to testify, and the defendant had a prior opportunity to cross-examine said witness. *Pointer v. Texas*, 380 U.S. 400, 406 (1965); *see also Crawford v. Washington*, 541 U.S. 36, 59 (2004).

"[T]he right of confrontation is a forfeitable right—not a waivable-only right—and must be preserved by a timely and specific objection at trial." *See Deener v. State*, 214 S.W.3d 522, 527 (Tex. App.—Dallas 2006, pet. Ref'd); *see also Davis v. State*, 313 S.W.3d 317, 347 (Tex. Crim. App. 2010) (holding Confrontation Clause claims must be preserved by timely and specific objection). Generally, to preserve error for appellate review, a party must make a timely request, objection, or motion stating the grounds for the ruling sought from the trial court. *See* TEX. R. APP. P. 33.1(a)(1)(A). An appellant fails to preserve error when she does not object to the remote testimony of a State's witness. *Jones v. State*, No. 05-21-00019-CR, 2022 WL 854915, at *4 (Tex. App.—Dallas Mar. 23, 2022, no pet.) (mem. op., not designated for publication) (citing Davis, 313 S.W.3d at 347); *Broussard v. State*, No. 09-20-00259-CR, 2022 WL 2056388, at *7

12

(Tex. App.—Beaumont June 8, 2022, no pet.) (mem. op., not designated for publication); *Oliver v. State*, No. 03-19-00725-CR, 2020 WL 5105209, at *2 (Tex. App.—Austin Aug. 27, 2020, pet. ref'd) (mem. op., not designated for publication).

Guerra complains that when the State's witnesses, Cesar Ramirez and Abby Daniel, testified by Zoom, her right to physically confront witnesses was violated. Daniel was a registered nurse who drew Guerra's blood on the day of the collision. Ramirez was the blood analyst who conducted testing of Guerra's blood specimens.

In support, Guerra argues the Court of Criminal Appeals has held that a trial court is not authorized to conduct a plea proceeding via videoconferencing without the defendant's written consent. *See Lira v. State*, 666 S.W.3d 498, 519 (Tex. Crim. App. 2023). Guerra argues that, just as there is a substantive right for a defendant to be present at a critical proceeding, she had a substantive right to confront adverse witnesses in person, and such right could only be waived by a knowing and intelligent written waiver. For two reasons, we disagree.

First, Guerra was physically present in the courtroom and waived any objection to Zoom testimony. The record shows the parties agreed to witness Abby Daniel testifying via Zoom. Prior to Daniel testifying, the trial court asked Guerra whether she agreed to the witness testifying via Zoom to which Guerra answered in the affirmative. Second, after a full day of testimony from the State's witnesses, the parties discussed with the trial court that another of its witnesses, Cesar Ramirez, would not be in town to testify until two days later. Guerra's counsel suggested the witness testify via Zoom and stated she would not object to the testimony. The trial court asked Guerra whether she was giving up her right to confront the witness face-to-face, to which she answered affirmatively.

The record supports that Guerra failed to object to Ramirez's and Daniel's testimony via Zoom. Accordingly, she failed to preserve error. *See* TEX. R. APP. P. 33.1; *Davis*, 313 S.W.3d at 347. We overrule Guerra's first issue.

### C. Jury confusion

In her second issue, Guerra contends the trial court erred in not granting her motion for mistrial based on jury confusion. Guerra argues a series of written notes from the jury during their deliberations suggested it had become confused by the trial court's instructions and, relatedly, the numerous verdict forms. Guerra urges the trial court erred in continuing the jury's deliberation; and erred in not granting her request for a mistrial. The State counters that Guerra effectively withdrew her request for a mistrial after she learned the basis of her request—that is, that the jury had become confused with the instructions and related verdict forms—was in fact a mistaken perception of the trial court. Because no jury confusion is shown by the record, the State urges the trial court did not err in denying a mistrial based on jury confusion.

"A mistrial is the trial court's remedy for improper conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (en banc) (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Id*. A trial court's refusal to grant a mistrial is reviewed under an abuse of discretion. *Id*. "In reviewing a trial court's ruling on a motion for mistrial, an appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Gonzalez v. State*, No. 08-14-00293-CR, 2019 WL 1553583, at *17 (Tex. App.—El Paso Apr. 10, 2019, pet. Ref'd) (citing *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007)).

14

After the jury had begun its second day of deliberations at the close of the guilt/innocence stage of trial, it sent the first of a series of notes to the trial court at about 9:04 a.m. The handwritten note simply said, "[t]he jury has reached a verdict." After calling for a bench conference, the trial court informed counsel of the following: "So it appears that they did not write it on the paper, that they were just going to come in and tell us." The trial court further reported it had instructed the jury to fill in the paperwork, ensuring it considered all charges and special issues. Minutes later, at 9:26 a.m., the jury sent a second note. The note stated, "[p]lease clarify charges if guilty on Count V vs guilty on Count II." The trial court soon responded in writing stating: "Please refer back to the charge of the Court." At 9:56 a.m., the jury sent a third note, again stating it had reached a verdict and it was ready to present.

When the jury returned to the courtroom, the trial court asked the presiding juror whether the jury's verdict was unanimous. The presiding juror responded, "Yes, ma'am." The court next asked for the juror to hand it to the bailiff for the court to review. Again, the court called for counsel to approach the bench, notifying counsel it was sending the jury back because the verdict was not "the way it should be."[3]

When the bench discussion concluded, the trial court turned to the jurors and announced: "Ladies and gentlemen of the jury, I'm going to send you back to the jury room. The verdict form is a little bit incorrect. Let me send you back to the jury room, and I'll discuss with counsel how we want to approach." Soon, the trial court sent a note to the jury asking them to refer to page five of the jury charge. The referred-to portion of the charge stated:

> First consider Count V, regarding the offense of Murder, and if your verdict is "guilty" on Count V, then do not consider Count II, Intoxication Manslaughter, and

---

[3] During an in-chamber discussion, Guerra's counsel summarized what had occurred earlier in the courtroom by stating, "[a]t that time the Court looks through the jury charge and it appears to have been signed guilty on all nine counts[.]"

also do not consider Count VI, Driving While Intoxicated Third or More IAT. Unless you so find beyond a reasonable doubt, or have a reasonable doubt thereof, you will acquit the Defendant of Murder, then next consider Count II, Intoxication Manslaughter and answer Verdict Form B-1 or B-2, and also consider Count VI, regarding Driving While Intoxicated Third or More IAT, and answer either Verdict Form F-1 or F-2. The other counts may be considered in any order that the jury chooses to consider them in.

At 11:03 a.m., the jury sent a fourth note stating: "We've read the last paragraph of page 5 and still cannot find the issue. Can you please confirm which page has issue?" Minutes later, at 11:11 a.m., the jury sent a fifth and final note asking: "What does IAT mean? When referred to in Count 6?" Before answering these last two notes, the trial court held a lengthy conference in chamber with counsel for both sides and outside the presence of the jury.

During the conference, Guerra requested a mistrial on the basis that the defense believed the jury charge "must be so deficient and confusing" that the jury clearly did not understand the law or the process of what it was asked to do. She urged that any verdict returned would not be in accordance with the law. In response, the State argued the jury's intent had been utterly clear. The trial court denied Guerra's motion for mistrial, informing the parties it would send the jury back to continue deliberating. Even still, based on their numerous inquiries, the trial court informed counsel it planned on bringing the jury back into the courtroom to again check the jury charge, making sure that correct information had been given.

After the jury entered and left the courtroom to deliberate further, another conference followed in chambers. Having checked the verdict forms, the trial court advised counsel it was now going to bring the jury in and tell them "its in proper form." The court further indicated it would ask the foreperson whether the verdict was in fact unanimous. The court next inquired whether either side wanted the jury polled. Guerra's counsel responded: "We will, out of an abundance of caution." The trial court noted to counsel, "this is the time to put your objections,

concerns." Defense counsel responded that, after speaking with Guerra, she would not be putting any additional objections on the record. However, defense counsel raised a new point. Counsel asked whether the court planned to inform the jury that it had now appeared its verdict was in proper form, and it was the judge who had in fact misread the verdict. Counsel explained she believed the jury was a bit frustrated, and she did not want them to take their frustration out on her client. Counsel requested the trial court inform the jury it had turned out their verdict was in proper form when it was returned the first, original time. Counsel stressed she wanted the jury to understand their verdict had been misread the first time.

When the trial court brought the jury back into the courtroom, it addressed the jury as follows:

> Ladies and gentlemen of the jury, in reviewing your verdict form, it is, in fact, in proper form. It was in proper form from the first part. There was a little bit of confusion, but it is in proper form. It has been in proper form from the get-go.
>
> So[,] let me ask [the jury foreperson] the question one more time, is this a unanimous verdict?

To the question asked, the jury foreperson answered, "Yes." After receiving the jury verdict from the bailiff, the trial court requested that Guerra stand. The court then read out load each verdict form of the several counts and the special issues. When polled by the trial court, each juror confirmed the verdict was in fact their verdict.

In her briefing on appeal, Guerra argues "the jury in this case was confused and mislead by the trial court's charge." She urges that such confusion deprived her of her right to trial by a competent jury, and to her right to due process of law. In support, Guerra points to the numerous written inquiries by the jury submitted to the trial court during their deliberations. Additionally, she points to the jury's initial indication it would report its verdict verbally, and not fill out verdict

forms. Guerra complains the trial court had a duty to reject an insufficient, unresponsive, incomplete, or informal verdict, call the jury's attention to the problem, and have the problem corrected either with the jury's consent or by sending them out to reconsider the verdict.

Guerra relies on two cited authorities, TEX. CODE CRIM. PROC. ANN. art. 37.10(a), and *Reese v. State*, 773 S.W.2d 314, 318 (Tex. Crim. App. 1989) (en banc). First, Article 37.10(a) of the Code of Criminal Procedure formally recognizes the existence of informal verdicts. *Traylor v. State*, 567 S.W.3d 741, 746 (Tex. Crim. App. 2018). The article sets out in relevant part:

> If the verdict of the jury is informal, its attention shall be called to it, and with its consent the verdict may, under the direction of the court, be reduced to the proper form. If the jury refuses to have the verdict altered, it shall again retire to its room to deliberate, unless it manifestly appear that the verdict is intended as an acquittal; and in that case, the judgment shall be rendered accordingly, discharging the defendant.

*See* TEX. CODE CRIM. PROC. ANN. art. 37.10(a). Based on this article, the Texas Court of Criminal Appeals has held that "to qualify as an informal verdict of acquittal, . . . the jury note must also be 'plainly intended to operate as acquittal'" *Traylor*, 567 S.W.3d at 747 (quoting *State ex rel. Hawthorn v. Giblin*, 589 S.W.2d 431, 432 (Tex. Crim. App. 1979)).

Second, in *Reese*, defendant was charged with two different offenses, namely, sexual assault of a child and compelling prostitution. *See Reese*, 773 S.W.2d at 315; TEX. PENAL CODE ANN. § 22.011; TEX. PENAL CODE ANN. § 43.05. Two different verdict forms were submitted to the jury. *Reese*, 773 S.W.2d at 316. One verdict form solely contained blanks for answering "guilty" or "not guilty" for the charge of sexual assault of a child. *Id*. The second verdict form, however, included two sets of blanks for answering "guilty" or "not guilty." *Id*. The first set of blanks applied to the greater offense of compelling prostitution, while the second set applied to the lesser included offense of prostitution. *Id*. The trial court noticed that only the verdict form in the

18

sexual assault case had been signed by the jury, whereas the jury neglected to return any verdict at all on the charge of compelling prostitution. *Id*. After the trial court informed the jury it had forgotten to sign a verdict on one of the charges, the jury resumed deliberations. *Id*. The jury then returned from deliberation having found appellant "guilty" of the compelling prostitution charge, but "not guilty" of the lesser included charge of prostitution. *Id*. Again, the trial court sent the jury back to read the charge with regard to the offense of compelling prostitution and whether or not it considered the lesser-included offense of prostitution. *Id*. Reese lodged no objection against the jury being sent back to deliberate at any time. *Id*. When the jury returned after having deliberated a third time, it submitted a verdict that included an original finding of "not guilty" on the lesser charge of prostitution, but it had been lined through and initialed by the foreman, and the "guilty" verdict blank had been signed. *Id*.

On direct appeal, Reese alleged the trial court erred in sending the jury back to the jury room for further deliberations without having read the verdict aloud in open court, and also erred in not giving defense counsel an opportunity to poll the jury after having received the verdict and before sending the jury back for further deliberations. *Id*. Although *Reese* noted, "it is obvious that the jury was confused by the forms and the numerous blanks," it nonetheless held the trial judge was correct in sending the jury back for deliberation, and it did not err in the procedure employed in accepting the verdict. *Id*. at 317-18.

Relying on both Article 37.10(a) and *Reese*, Guerra argues the trial court erred in continuing the jury's deliberations after jury confusion similarly arose in her case, and it erred in not granting a mistrial. Because we conclude her cited authorities are not supportive of her claim, we disagree. First, Guerra makes no claim on appeal that any of the jury notes operated as an informal verdict of acquittal, or that the jury's formal verdict was insufficient, unresponsive, or

19

incomplete. Consequently, her reliance on Article 37.10(a) is misplaced. Second, the record in the instant case does not show the jury was confused by the jury forms as was initially shown in *Reese*.

Ordinarily, we assume that a jury follows the instruction given, and we will not reverse in the absence of evidence that the jury was actually confused by the charge. *See Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996). Here, the record shows that Guerra initially moved for a mistrial based on jury confusion. Yet it later became clear that only the trial court had been confused in how it had viewed the jury's verdict and no jury confusion *in fact* was established. Indeed, the trial court informed the jury it had returned a verdict in proper form from "the get-go." Guerra neither objected nor otherwise disagreed with how the trial court characterized the jury's verdict. Because Guerra's cited authorities are not on point, and because the record does not support the factual predicate of her claim, we cannot say the trial court abused its discretion in denying her request for a mistrial during the guilt/innocence phase of trial.

We overrule Guerra's second issue.

### E. Punishment for Count VI

In Guerra's third issue, she asserts the trial court erred in reforming the jury's verdict on punishment for Count VI because the trial court imposed its own sentence and violated the province of the jury.

Following the punishment phase of trial, the jury returned punishment verdicts on each count that it had found Guerra guilty as charged. For Count VI, the offense of DWI third or more, the jury returned a punishment verdict of confinement for a term of 14 years' and a fine of $10,000. The jury's foreperson read the verdict aloud in court and the trial court discharged the jury from all duties as jurors. The trial court then sentenced Guerra in accordance with the jury's verdict. When the trial court later reconvened, defense counsel notified the trial court that the legal

punishment range for the DWI third or more would have been between two and 10 years. Defense counsel recommended a correction of the judgment before it was processed. Defense counsel suggested: "What I think should be done is that it should be 10 years, since 14 is outside of the legal punishment range." The trial court agreed and directed the court's clerk to correct the judgment on Count VI to reflect a sentence of 10 years' confinement and a $10,000 fine. The trial court later entered a judgment nunc pro tunc for Count VI reflecting a sentence of 10 years' confinement. On appeal, Guerra contends the trial court erred by imposing its own sentence.

Here, we agree that the jury returned a verdict that does not conform to the law applicable to the case. *See* TEX. PENAL CODE ANN. §§ 12.34(a)-(b), 49.09(b)(2) (indicating the offense of DWI third or more is a third-degree felony punishable by imprisonment for a term of not more than 10 years or less than 2 years and a fine not to exceed $10,000). However, the Texas Code of Criminal Procedure Article 37.10(b) states:

> If the jury assesses punishment in a case and in the verdict assesses both punishment that is authorized by law for the offense and punishment that is not authorized by law for the offense, the court shall reform the verdict to show the punishment authorized by law and to omit the punishment not authorized by law. If the trial court is required to reform a verdict under this subsection and fails to do so, the appellate court shall reform the verdict as provided by this subsection.

TEX. CODE CRIM. PROC. ANN. art. 37.10(b). When interpreting the intent of the statute, our sister courts have held:

> We do not believe the legislature intended punishment, whether fine or imprisonment, should be reduced to nothing when the jury assessed punishment in excess of that allowed by law. The obvious intent of article 37.10(b) is to authorize the court to reduce the punishment to that which is allowed by law.

*Howard v. State*, 766 S.W.2d 907, 908 (Tex. App.—Fort Worth 1989, no pet.); *see also Bailey v. State*, No. 10-11-00431-CR, 2012 WL 2445044, at *3 (Tex. App.—Waco June 27, 2012, no pet.)

(mem. op.) (quoting *Howard's* analysis and agreeing with such); *Vance v. State*, 970 S.W.2d 130, 132 (Tex. App.—Dallas 1998, no pet.) (same).

Guerra asserts the trial court wrongly participated in the deliberation process. As support, she relies on a case out of the Amarillo Court of Appeals to argue we must remand for a new hearing on punishment when the period of confinement assessed by the jury exceeds the maximum sentence authorized by law. *Montes v. State*, No. 07-98-0376-CR, 1999 WL 463098, at *1 (Tex. App.—Amarillo July 8, 1999, no pet.). However, we conclude the facts in *Montes* are distinguishable. There, the trial court assessed punishment at 12 months in jail, probated for 24 months, conditioned that the jail time be served. *Id.* Because a trial court cannot assess more than 30 days' confinement in jail as a condition of community supervision, and such terms are determined by the judge not the jury, the trial court's assessment was not authorized by law. *Id.* at *2. The Amarillo Court of Appeals noted that "[e]ven though an appellate court may reform a jury's verdict to eliminate punishment not authorized by law, the court cannot exercise the discretion vested solely in the trial judge to require or not require confinement in jail as a condition of community supervision." *Id.*

More aligned to the facts in this case are other cases where appellate courts uphold a trial court's reduction of jail time or fines to a statutory maximum for each. *See Bailey*, 2012 WL 2445044, at *3 (modifying the punishment fine to the maximum of $10,000 when the jury assessed a fine at $15,000 and the statute provided the fine not to exceed $10,000); *Vance*, 970 S.W.2d at 132 (upholding the trial court reformed judgment sentencing appellant to the statutory maximum of 365 days in jail when the jury assessed punishment at 730 days in jail); *Howard*, 766 S.W.2d at 908 (upholding the trial court's reformed judgment of the statutory maximum of a $1,000 fine when the jury assessed a $2,000 fine).

We agree with our sister courts and find that the obvious intent of Article 37.10(b) is to authorize the court to reduce the punishment to that which is allowed by law. *See Bailey*, 2012 WL 2445044, at *3; *Vance*, 970 S.W.2d at 132; *Howard*, 766 S.W.2d at 908. Moreover, the record shows that Guerra never objected to the trial court's reformation. Rather, she suggested the reformation. *See Woodall v. State*, 336 S.W.3d 634, 644 (Tex. Crim. App. 2011) ("The law of invited error provides that a party cannot take advantage of an error that it invited or caused, even if such error is fundamental.").

We overrule Guerra's third issue.

## TRIAL COURT'S CERTIFICATION OF THE RIGHT TO APPEAL

As a final matter, we address the absence of Guerra's signature on the Certification of Defendant's Right of Appeal. We note that our record includes a certification of Guerra's right to appeal this criminal case. However, the certification does not bear her signature indicating she was informed of not only her right to direct appeal to this Court but also to petition the Texas Court of Criminal Appeals should she so desire. *See* TEX. R. APP. P. 25.2(d). We hold the certification is defective in its present form and also that it has yet to be corrected by Guerra's attorney.

To remedy this defect, this Court ORDERS Guerra's attorney to send Guerra a copy of this opinion and this Court's judgment, to notify her of her right to file a pro se petition for discretionary review, and to inform Guerra of the deadlines applicable to her case. *See* TEX. R. APP. P. 48.4, 68; *see also Ex parte Wilson*, 956 S.W.2d 25, 26-27 (Tex. Crim. App. 1997) (en banc) (holding that an appellate attorney has a duty to inform a defendant of "the fact that his conviction has been affirmed" and that "[the defendant] can pursue discretionary review on his own"). Communicating this information will protect Guerra's right to file a petition for discretionary review with the Court of Criminal Appeals, even though she does not necessarily have a constitutional right to appointed

23

counsel in preparing such a petition. *See Ex parte Wilson*, 956 S.W.2d at 27. Guerra's attorney is further ORDERED to comply with all of the requirements of TEX. R. APP. P. 48.4.

## CONCLUSION

Finding no error, we affirm.


GINA M. PALAFOX, Justice

August 25, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.

(Do Not Publish)

24